UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
FRANKFORT DIVISION

*Electronically Filed*

BENJAMIN FOSTER
AND
EDWARD BRITTON                                                        **PLAINTIFFS**

V.                                            **CASE NO.**

CRAIG C. DILGER, IN HIS OFFICIAL
CAPACITY AS CHAIRMAN, KENTUCKY
REGISTRY OF ELECTION FINANCE                           **DEFENDANT**


**MEMORANDUM IN SUPPORT OF
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**INTRODUCTION**

The First Amendment right to free speech, as incorporated by the Fourteenth Amendment, protects the right of candidates and contributors to disseminate their political message free from excessive government intrusion. Here, Plaintiffs seek to contribute more than the $100 individual contribution limit imposed by KRS § 121.150(6) to their chosen candidate(s) in school board elections. Because the increasing costs of school board elections make it difficult for candidates hampered by KRS § 121.150(6) to meaningfully participate in the democratic process, and because independent expenditures by special interest groups significantly outpace individual contributions, the contribution limit impermissibly restricts Plaintiffs' right to engage in political advocacy. Plaintiffs seek preliminary and permanent injunctive relief barring Defendant's enforcement of the challenged contribution limit as contrary to the First Amendment's Free Speech Clause. As explained fully below, the relevant factors weigh of favor

of granting Plaintiffs' requested preliminary injunction; thus, the Court should preliminarily enjoin Defendant Dilger's enforcement of KRS § 121.150(6) to allow school board candidates and contributors the ability to engage in the open and robust political advocacy envisioned by the First Amendment.

## STATEMENT OF THE FACTS

Plaintiffs are individuals who wish to contribute more than the maximum amount permitted under KRS § 121.150(6) to candidates for the Jefferson County School Board in 2010, but who are unable to do so for fear of criminal prosecution. (Complaint, ¶¶ 1, 10). Under KRS § 121.150(6), an individual donor is only allowed to contribute a maximum of $100 to her chosen school board candidate(s). *Id*. But due to the increasing cost of mounting an effective school board election campaign, Plaintiffs wish to contribute more than the statutory maximums in 2010 to the candidates of their choice. (Complaint, ¶¶ 1, 11-12).

In Jefferson County, the increasing cost of school board elections is driven, in part, by the large independent expenditures that the Jefferson County Teachers Association ("JCTA"), a local teachers union, spends in promoting its endorsed candidates.[1] For example, in 2006, JCTA spent over $350,000.00 to promote its endorsement of incumbent school board members. (**Exhibit A**). In 2008, JCTA spent nearly $150,000.00 in support of school board candidate Stephen Imhoff. (**Exhibit B**). JCTA's sizeable independent expenditures make it difficult, if not impossible, for non-JCTA supported candidates to compete in a meaningful manner when constrained by the impermissibly low contribution limit challenged here.

---

[1] Plaintiffs do not allege that JCTA's expenditures are inappropriate or otherwise unlawful. Rather, JCTA's independent expenditures, when contrasted with the impermissibly low contribution limit of KRS § 121.150(6), emphasizes the statute's unconstitutional effect upon individuals seeking to contribute to their chosen candidate(s).

The impact of such independent expenditures is further highlighted when viewed in the context of individual contributions. Specifically, in 2006, JCTA-supported candidate Debbie Wesslund raised $4,880.00 from individual contributions. (**Exhibit C**). Wesslund's opponent, Patrick O'Leary, raised $3,150.00. (**Exhibit D**). Despite the relative closeness of their fundraising numbers, independent expenditures in favor of Wesslund exceeded $100,000. (**Exhibit A**).

Similarly, Plaintiff Benjamin Foster ran as a non-JCTA supported candidate in the 2008 school board election. (Complaint, ¶ 17). Restrained by the low contribution limits of KRS § 121.150(6), Foster raised $2,923.00 from 34 donors. (**Exhibit E**). Of the 34 donors, 23 contributed the maximum amount allowed under KRS § 121.150(6). (*Id*.). In addition to a personal loan to his campaign, Foster raised a total of $5,543.24. (*Id*.). In contrast, Foster's opponent, Larry Hujo, received the benefit of more than $160,000.00 in independent expenditures by JCTA. (**Exhibit F**).

Foster and co-Plaintiff Britton assert that KRS § 121.150(6) violates the First Amendment, in that the statute's contribution limit of $100 per individual impermissibly curtails political speech and advocacy. (Complaint, ¶¶ 19-22). Accordingly, Plaintiffs now seek a preliminary injunction barring Defendant's enforcement of the statute.

## ARGUMENT

Four factors are considered in determining whether a preliminary injunction should be granted: (1) the likelihood of the plaintiff's success on the merits; (2) whether the injunction will save the plaintiff from irreparable injury; (3) whether the injunction would harm others; and (4) whether the public interest would be served. *International Longshoremen's Association v. Norfolk Southern Corp.*, 927 F.2d 900, 903 (6th Cir. 1991). The factors for a preliminary

injunction are not rigid requirements; rather, "[a] balancing is required, and not the mechanical application of a certain form of words." *Wilkinson v. Jones*, 876 F. Supp. 916, 924 (W.D. Ky. 1995); *see also Suster v. Marshall*, 149 F.3d 523, 528 (6th Cir. 1998) ("[t]hese factors simply guide the discretion of the court…."). Findings are required for each of the factors, "unless fewer are dispositive of the issue." *In re DeLorean Motor Co.*, 755 F.2d 1223, 1228 (6th Cir. 1985).

"The First Amendment has its fullest and most urgent application to speech uttered during a campaign for political office." *Citizens United*, slip op. at 23 (citing *Eu v. San Francisco County Democratic Central Comm.*, 489 U.S. 214, 223 (1989)). Yet the individual contribution limit of KRS § 121.150(6) unconstitutionally impedes effective and meaningful political advocacy by school board candidates and their contributors. Plaintiffs, individuals who wish to contribute outside the limits of KRS § 121.150(6) but refrain from doing so for fear of criminal prosecution, seek to enjoin Defendant from enforcing the unconstitutional provision of the statute.

Here, a preliminary injunction is appropriate for the following reasons. First, under the "closest scrutiny" of *Buckley v. Valeo*, 424 U.S. 1 (1976), the $100 contribution limit is too low to permit effective and meaningful political advocacy under the First Amendment. The limit does not serve a compelling governmental interest, nor is it narrowly tailored to achieve an appropriate governmental interest. Second, Plaintiffs will suffer irreparable harm because the statute, through the threat of criminal sanctions, denies them the right to engage in protected First Amendment activity. Third, Plaintiffs' harm outweighs any harm Defendant will suffer from being enjoined from enforcing the statute. And finally, the public interest is served by the injunction, in that it would result in more speech and prevent the continued chill on First Amendment activity occasioned by the threat of enforcement of an unconstitutional statute.

## I.  Strict scrutiny applies because contribution limits are restrictions on political speech.

The Supreme Court has squarely held that contribution restrictions are direct burdens on political speech. *Davis v. Federal Election Commission*, 554 U.S. ---, 128 S. Ct. 2759, 2771 (2008). The Court reiterated in the October 2009 term that "[l]aws that burden political speech are subject to strict scrutiny, which requires the [g]overnment to prove that the restriction furthers a compelling interest." *Citizens United v. Federal Election Commission*, 558 U.S. --- (2010), slip op. at 23 (citing *Federal Election Commission v. Wisconsin Right to Life*, 551 U.S. 449, 464 (2007) (opinion of Roberts, C.J.)). Thus, strict scrutiny applies to the restriction at issue here, even if the standard is identified by one of its numerous synonyms such as "closest scrutiny," "exacting scrutiny," or "rigorous scrutiny." *See Buckley*, 424 U.S. at 25 (contribution limits are "subject to the closest scrutiny"); *see also Dubay v. Wells*, 506 F.3d 422, 428-29 (6th Cir. 2007) (using "exacting scrutiny" and "strict scrutiny" interchangeably).[2]

Strict scrutiny, regardless of the synonym used, means exactly what strict scrutiny has always meant—the Defendant must show (1) a compelling state interest; and (2) that the means chosen are narrowly tailored to achieve that interest. *See Citizens United*, slip op. at 23.[3] Strict

---

[2] If analyzed under a less rigorous standard, the contribution limit set forth in KRS § 121.150(6) is still unconstitutional. *See, e.g., California Prolife Council PAC v. Scully*, 989 F. Supp. 1282, 1299 (E.D. Cal. 1998) (applying lesser form of scrutiny to hold contribution limits of $100 unconstitutional); *but see Colorado Republican Federal Campaign Committee v. Federal Election Comm'n*, 518 U.S. 604, 640-41 (1996) (Thomas, J., concurring in part) ("I am convinced that under traditional strict scrutiny, broad prophylactic caps on both spending and giving in the political process…are unconstitutional").

[3] *See, e.g., Anderson v. Spear*, 356 F.3d 651, 670 (6th Cir. 2004) (applying strict scrutiny to *ex post* election contributions); *Suster v. Marshall*, 149 F.3d 523, 532 (6th Cir. 1998); *Russell v. Burris*, 146 F.3d 563 (8th Cir. 1998) (citing *Timmons v. Twin Cities Area New Party*, 520 U.S. 351 (1997)); *Carver v. Nixon*, 72 F.3d 633, 637 (8th Cir. 1995) ("when the Court in *Buckley* analyzed contribution limits, it articulated and applied a strict scrutiny standard of review"); *Day v. Holahan*, 34 F.3d 1356, 1365 (8th Cir. 1994) (applying strict scrutiny to contribution limits); *National Black Police Association v. District of Columbia Board of Elections and Ethics*, 924 F.

scrutiny creates a presumption that KRS § 121.150(6) is unconstitutional, and Defendant has the burden to show otherwise. *See, e.g., Lac Vieux Desert Band of Lake Superior Chippewa Indians v. Michigan Gaming Control Bd.*, 276 F.3d 876, 879 (6th Cir. 2002). Because the Defendant cannot show that the $100 contribution limit for school board elections is narrowly tailored to serve a compelling interest, a preliminary injunction should be granted.

**II.     Plaintiffs are entitled to a preliminary injunction because all of the elements weigh in favor of granting the injunctive relief.**

**A. Plaintiffs have a substantial likelihood of prevailing on the merits of their claims.**

In *Buckley*, the Court recognized that in some cases "contribution restrictions could have a severe impact on political dialogue if the limitations prevented candidates and political committees from amassing the resources necessary for effective advocacy." *Buckley*, 424 U.S. at 21. The Court added in *Nixon v. Shrink Missouri Government PAC*, 528 U.S. 377 (2000), that contribution limits are unconstitutional if the limits "render political association ineffective, drive the sound of a candidate's voice below the level of notice, and render contributions pointless." *Id*. at 397. The main consideration, according to the Court, is not "about the power of the dollar, but must go to the power to mount a campaign with all the dollars likely to be forthcoming." *Id*.

The Court's observation that in some instances contribution limits may effectively silence a candidate's voice and render contributions "pointless" applies here. In Jefferson County School Board elections, candidates who rely solely on individual contributions are at a significant disadvantage compared to JCTA-supported opponents. For instance, when Plaintiff Benjamin Foster ran for election in 2008 using only individual contributions and a personal loan, he was outspent at a ratio of almost 30 to 1. (Complaint, ¶¶ 14, 17). For Foster to raise $160,000, he

---

Supp. 270, 282 (D.D.C. 1996), *vacated as moot in* 108 F.3d 346 (D.C. Cir. 1997); *Wilkinson v. Jones*, 876 F. Supp. 916, 925 (W.D. Ky. 1995).

would have had to obtain $100 contributions from 1,600 individuals. (*Id*.). Similarly, O'Leary raised $3,150 from individual contributions, but was outspent roughly 34 to 1. To keep pace with JCTA's independent expenditures, O'Leary would have needed $100 from at least 1,000 contributors. (*Id*.). Meanwhile, their opponents, once endorsed by the JCTA, received the benefit of independent expenditures, effectively rendering additional fundraising unnecessary. Thus, the rising amount of expenditures in Jefferson County school board elections, paired with the low individual contribution limit of KRS § 121.150(6), curtails "the ability of the citizenry to make informed choices among candidates for office…." *Buckley*, 424 U.S. at 14-15.

The disparity between JCTA's independent expenditures and the inability of non-JCTA candidates to effectively fundraise in light of KRS § 121.150(6)'s contribution limit is of constitutional concern. For example, in *Wilkinson*, the district court considered the constitutionality of KRS § 121A.050(1), which imposed a $100 contribution limit for privately financed gubernatorial candidates and a $500 contribution limit for publicly financed candidates. *Wilkinson*, 876 F.Supp. at 925, 928 (noting that contribution limits are content-based restrictions on speech and that "[o]nly when content-based restrictions on speech are narrowly tailored to meet a compelling state interest may they be upheld as constitutional"). In finding the $100 contribution limit unconstitutional, the court relied on the 5 to 1—actually, 15 to 1 in practice—disparity in the respective contribution limits:

> An annual $100 limit on contributions to or by political funds and committees is too low to allow meaningful participation in protected political speech and association, and thus is not narrowly tailored to serve the state's legitimate interest in protecting the integrity of the political system.

*Id.* at 929 (citing *Day*, 34 F.3d at 1366).

7

The Eighth Circuit in *Carver* reached a similar conclusion. There, the Eighth Circuit ruled a $100 contribution limit invalid because it was not "in any way narrowly tailored or carefully drawn…." *Carver*, 72 F.3d at 642. In doing so, the Eighth Circuit rejected the state's anti-corruption rationale to justify the $100 contribution limit. *Id.* at 642, 644 ("[t]he question thus becomes whether Missouri must adopt the lowest contribution limits in the nation to remedy the corruption caused by campaign contributions"); *see also Kruse v. City of Cincinnati*, 142 F.3d 907, 913 (6th Cir. 1998) (noting that anti-corruption is the only compelling justification for contribution limitations). According to the court, the $100 contribution limit was arbitrary and "nearly four times as restrictive as the limits approved in *Buckley*…." *Id*. The court concluded, "[t]he limits are not closely drawn to reduce corruption or the appearance of corruption associated with large campaign contributions." *Id*. Therefore, *Carver* makes clear that constitutionally-excessive contribution limits—such as those in KRS § 121.150(6)—are not sufficiently tailored to advance an otherwise legitimate anti-corruption interest.

This conclusion draws further support from Judge Simpson's observations in *Wilkinson*. Specifically, Judge Simpson noted that "[t]he parties know of no state which imposes a contribution limit as low as $100 on any candidate with the exception of Kentucky's $100 limitation placed upon candidates running for school board." *Id*. at 929. This observation remains true: Kentucky is the only state that imposes such a severe contribution limit in school board elections. This contribution limit is presumably kept low because of an exaggerated anti-corruption rationale. *See Suster*, 149 F.3d at 532 ("the prevention of corruption is the only interest the Supreme Court has…give[n] credence"); *see also Kruse*, 142 F.3d at 915 ("money legally raised by candidates themselves poses no risk of quid pro quo corruption…."). As in

8

*Carver*, however, the question is whether Kentucky's contribution limit is narrowly tailored to advance that interest. And, similar to *Carver*, the answer to that question is straightforward—no.

Any attempt by Defendant to argue that alternatives to direct contributions exist for school board candidates and their contributors is undermined by *Carver*. In *Carver*, the state suggested that $100 contribution limits did not violate the First Amendment because candidates and contributors could "find other outlets" to express their message. *Id*. at 640-41. In response, the court stated that the argument was irrelevant. The argument "[did] not address whether the limits were so low as to prevent [the plaintiff] from freely associating with a candidate." *Id*. The existence of alternatives to engage in speech activity will not preserve contribution limits that are not narrowly tailored. *See generally id*. The $100 contribution limit of KRS §121.150(6) falls squarely in that category; therefore, it is unconstitutional.

Similarly, the district court in *National Black Police Association* also rejected the notion that "other outlets" were available to candidates and contributors. There, the district court held $100 and $50 contribution limits unconstitutional. 924 F. Supp. at 272, 282. In reaching its conclusion, the court described the testimony of one candidate:

> Ron Magnus testified that inexpensive methods of campaigning, including door-to-door and attending candidate forums, were not effective ways of contacting large numbers of voters. Magnus also testified that the caps limited his 1994 Ward 5 campaign budget so much that he could not use radio and newspaper advertising, could not have a phone bank active for a long period of time, and could not conduct three ward-wide mailings. Because he was unable to carry out these plans, Magnus believed he reached only about 4,000 of the approximately 41,000 Democratic voters in Ward 5.

*Id*. at 280. Further, inflation has eroded the purchasing power of the dollar. *See Day*, 34 F.3d at 1366 (noting that a $100 contribution in 1976 would have a value of $40.60 in 1994 dollars); *Russell*, 146 F.3d at 570 (same). In essence, with low inflexible contribution limits, candidates

9

spend less time with voters and more time fundraising—with diminishing returns. *See, e.g., Randall v. Sorrell*, 548 U.S. 230, 261 (2006) (opinion of Breyer, J.) (noting that limits not indexed for inflation "decline in real value each year").[4]

With candidates spending more time fundraising, restrictive contribution limits cause a breakdown in political discourse. The district court in *National Black Police Association* explained the dilemma many candidates face because of unconstitutionally low contribution limits:

> Ray's pattern of campaign activity changed after the enactment of Initiative 41. In 1994, he devoted 80 to 90 percent of his time to fund-raising, which was a significant increase from 1990. In 1994, in order to work with the new contribution limits, Ray decided that he would have to hold only fund-raising events. In 1990 he was able to hold events where contributions were not requested. Because many voters did not attend events if they had to contribute to Ray's campaign, Ray reached fewer voters at campaign events in 1994.

*Id*. at 278; *see also Kruse*, 142 F.3d at 919 (Cohn, D.J., concurring) ("[t]here is an independent interest in freeing officeholders from the pressures of fundraising so they can perform their duties"). Thus, "by depriving donors of their right to speak through the candidate, contribution limits relegate donors' point of view to less effective modes of communication" and "curtails individual participation." *Shrink*, 528 U.S. at 418 (Thomas, J., dissenting).

While the Sixth Circuit upheld the validity of $100 contribution limits in *Frank v. City of Akron*, 290 F.3d 813 (6th Cir. 2002), that decision is inapplicable here. In *Frank*, the City of Akron passed a campaign finance ordinance to impose a $100 contribution limit on city council candidates and a $300 limit on mayoral candidates by referendum. *Id*. at 816. The court, with little analysis or precedential authority, held the contribution limits constitutional. *Id*. at 818. In

---

[4] Like the Vermont contribution limits of $400, $300, and $200 invalidated by the Court in *Randall*, KRS 121.150(6) is also not indexed for inflation. *See id*., at 261.

dissent, Judge Gilman noted the numerous flaws in the majority's opinion. Most notably, the majority did not the address weight of authority finding $100 contribution limits unconstitutional. *Id.* at 821 (Gilman, J., dissenting). The majority also relied on the flawed notion that "other outlets" for First Amendment expression are available to candidates and potential contributors. *See, e.g., National Black Police Assoc.*, 924 F. Supp. at 278; *see also Carver*, 72 F.3d at 640 ("voters may not adopt an unconstitutional law any more than the legislature").

And, in *Frank*, the court also did not address whether Akron's ordinance infringed on the First Amendment's guarantees of free expression and unfettered political discourse. *See Frank*, 290 F.3d at 816. There, the court only addressed whether the contribution limits violated the plaintiffs' First Amendment right to association. *Id.* at 816. Second, the court stated that the elections in Akron were "relatively inexpensive" and "rarely rely on the mass media campaigns seen on the national level…." *See id.*, at 818. That is not the case here. Jefferson County School Board elections are both hotly contested and costly. For four candidates in the 2006 elections, for example, the average independent expenditure was nearly $89,000.00. In short, the campaigns at issue here do not resemble those in *Frank*.

The conclusion that the individual limit of KRS § 121.150(6) is unconstitutional is further supported by the decision in *Scully* striking down a $100 contribution limit. There, the District Court for the Eastern District of California considered the validity of a referendum approving $100 contribution limits in certain elections. 989 F. Supp. at 1292. The referendum also approved limits of $250, $500, and $1,000 in other elections. *Id.* Before addressing the constitutionality of the referendum, the district court first dispensed with the notion that a state legislature was entitled to deference in campaign finance cases. *Id.* at 1299 ("deference afforded to legislative findings does not foreclose our independent judgment of the facts bearing on an

11

issue of constitutional law"). The district court then pointed to the differences between the variable contribution limits:

> [T]he adoption of the variable limits reflects a conclusion on the part of the voters that the $200 limit suffices to address the issue of corruption even if it is not the lowest amount which would do so. That conclusion requires a finding that the lower limit is not closely drawn.
>
> …[t]he voters may well have concluded that there is no amount so low that it will not tempt someone. In any event, they apparently concluded that in effect, a $200 limit works as well as a $100 limit.

*Id*. at 1296, 1297 n. 34. Subsequently, the district court concluded that the referendum was unconstitutional and enjoined its enforcement.

In sum, the district court in *Scully* made the observation that if one contribution limit is sufficient to prevent corruption, then the need to have a lower limit is unnecessary and not narrowly tailored. *Id*. As in *Scully*, KRS § 121.150(6) has multiple contribution limits. Candidates may accept, and donors may contribute, up to $1,000 in all other elections governed by the statute. KRS § 121.150(6). While the state legislature determined that a $1,000 contribution limit was sufficient to prevent corruption in elections, the statute provides no justification for treating school board elections differently. *See Randall*, 548 U.S. at 261 ("we have found nowhere in the record any special justification that might warrant a contribution limit so low or so restrictive as to bring about the serious associational and expressive problems that we have described"). Yet as the district court recognized in *Scully*, the $1,000 limit in KRS § 121.150(6) must work to stop corruption as much as the $100 individual limit. *Id*. at 1296-97. Because the state legislature made an unjustifiable distinction between school board and other elections, the logic of *Scully* is applicable. The contribution limits of KRS § 121.150(6) are simply not narrowly tailored to survive constitutional scrutiny.

There can be no question, then, that the contribution limit at issue curbs protected First Amendment activity. When candidates are silenced or prevented from engaging in political speech altogether, the general public suffers. *See Shrink*, 528 U.S. at 419 (Thomas, J., dissenting). The individual contribution limit of KRS § 121.150(6) both silences and prevents school board candidates from meaningfully participating in the democratic process. That problem is exacerbated in Jefferson County, in particular, where independent expenditures for individual candidates routinely exceed $70,000. Candidates face immense difficulty raising sufficient funds to compete against JCTA-supported candidates. (Complaint, ¶¶ 13-19). In turn, limited funds affect the ability of candidates to promote their ideas to the public. In face of increasing independent expenditures, $100 is simply inadequate to permit candidates to effectively campaign and compete in Jefferson County and elsewhere.

"There is a point at which regulatory incentives stray beyond the pale." *Wilkinson*, 876 F. Supp. at 929. Such is the case here. While KRS § 121.150(6) may have laudable goals, "First Amendment standards…must give the benefit of any doubt to protecting rather than stifling speech." *Citizens United*, slip op. at 10 (citations omitted).  The primary objective of the First Amendment is to protect and promote political speech. It is designed "to assure [the] unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *Buckley*, 424 U.S. at 14 (citing *Roth v. United States*, 354 U.S. 476, 484 (1957)). The individual contribution limit of KRS § 121.150(6) is contrary to that goal. Thus, to effectuate the protections of political speech guaranteed by the First Amendment, the preliminary injunction should be granted because there is a substantial likelihood of Plaintiffs' success on the merits.

### B. Plaintiffs will suffer irreparable harm without the preliminary injunction.

Candidates undoubtedly have a First Amendment right to communicate their ideas to the general public. *See, e.g., Family Trust Foundation of Kentucky, Inc. v. Wolnitzek*, 345 F. Supp.2d 672, 711 (E.D. Ky. 2004). And citizens certainly have a First Amendment guarantee to receive information from candidates. *See, e.g., Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council*, 425 U.S. 748, 756 (1979). Plaintiffs wish to contribute in excess of the $100 contribution limit of KRS § 121.150(6) in the 2010 school board elections. (Complaint, ¶¶ 10-11). They cannot do so, however, because KRS § 121.900(3) imposes criminal penalties for violating KRS § 121.150(6).[5] There is no doubt that imposing criminal penalties for protected First Amendment political advocacy would be indeed irreparable. *See, e.g., Suster*, 149 F.3d at 533. And refraining from engaging in First Amendment activity for fear of criminal prosecution also constitutes irreparable injury. *See, e.g., Planned Parenthood Affiliates of Michigan, Inc. v. Miller*, 21 F. Supp.2d 740 (E.D. Mich. 1998).

Political advocacy is at the core of First Amendment protection. *See, e.g., Mills v. Alabama*, 384 U.S. 214, 218 (1966). The Court recognizes that "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 372 (1976); *see also Newsom v. Norris*, 888 F.2d 371, 378 (6th Cir. 1989) ("even minimal infringement upon First Amendment values constitutes irreparable injury sufficient to justify injunctive relief"). Because the individual contribution limit of KRS § 121.150(6) is an infringement upon First Amendment rights, the irreparable harm in this case is twofold: (1) Plaintiffs face criminal prosecution for engaging in protected First Amendment

---

[5] KRS 121.990(3) provides in relevant part: "[a]ny person who knowingly violates any of the provisions…of KRS 121.150 to 121.230…or KRS Chapter 121A, shall, for each offense, be guilty of a Class D felony."

14

activity; and (2) the contribution limits are a denial of First Amendment rights. Accordingly, injunctive relief should be granted. *See Buckley*, 424 U.S. at 24 ("the primary First Amendment problem raised by the Act's contribution limitations is their restriction of one aspect of the contributor's freedom of political association").

### C. There is no likelihood of harm to the Defendant if the preliminary injunction is granted.

In contrast to the irreparable harm Plaintiffs face by the enforcement of KRS § 121.150(6), the degree of harm on Defendant is minimal. This is true for two reasons. First, as the Sixth Circuit recognized in *Déjà Vu of Nashville, Inc. v. Metro Gov't of Nashville*, 274 F.3d 377, 400 (6th Cir. 2001), "no substantial harm can be said to inhere in [the] enjoinment of a law once plaintiffs establish likelihood of success of constitutional claim." *River Oaks Management, LLC v. Brown*, No. 3:06-CV-00451-S, 2007 WL 2571909, *1, at *8 (W.D. Ky. Sept. 4, 2007) (characterizing *Déjà Vu*). As discussed above, Plaintiffs identify a number of reasons why KRS §121.150(6) is patently unconstitutional.

Second, a carefully worded injunction would permit Defendant to enforce the remaining provisions of Kentucky's campaign finance law. *See, e.g., Center for Individual Freedom v. Ireland*, No. 1:08-00190, 2008 U.S. Dist. LEXIS 33222, *1, at *19 (S.D. W. Va. Apr. 22, 2008) (granting preliminary injunction enjoining state from enforcing its restrictions on issue advocacy). Nor is there any risk that future school board candidates or their contributors will be prejudiced by enjoining the statute's enforcement. Candidates and contributors will not be prevented from engaging in political speech; in fact, their ability to do so may increase if KRS § 121.150(6) is found unconstitutional. Additionally, the next school board election in Jefferson

15

County takes place on November 2, 2010.[6] All candidates will be equally affected by this Court's injunction of the statute. *See Suster*, 149 F.3d at 533.[7]

### D. The public interest will be served by enjoining KRS § 121.150(6).

"It is in the public interest not to perpetuate the unconstitutional application of a statute." *Martin-Marietta Corp. v. Bendix Corp.*, 690 F.2d 558, 568 (6th Cir. 1982). The individual contribution limit of KRS § 121.150(6) restricts the dissemination of ideas by candidates to the citizenry. The statute also reduces the ability of the public to effectively evaluate candidates. *See, e.g., Citizens United*, slip op. at 23 ("[s]peech is an essential mechanism of democracy, for it is the means to hold officials accountable to the people"). The First Amendment is predisposed to allowing more speech, particularly when that speech involves the qualifications of a candidate for office. *See Eu*, 489 U.S. at 223; *see also Brown v. Hartlage*, 456 U.S. 45, 53 (1982) ("[t]he free exchange of ideas provides special vitality to the process traditionally at the heart of American constitutional democracy—the political campaign").

Thus, "there is no public interest in enforcing a law that curtails debate and discussion regarding issues of political import." *Suster*, 149 F.3d at 533 (citing *Citizens Against Rent Control/Coalition for Fair Housing v. City of Berkeley*, 454 U.S. 290 (1981)). The Sixth Circuit's observation in *Suster* governs here; the individual contribution limit of KRS § 121.150(6) prohibits protected core First Amendment activity—political advocacy. Accordingly, the preliminary injunction should be granted and the statute declared unconstitutional.

---

[6] *See* Louisville Jefferson County Election Center, Kentucky State Elections Schedule Results Through2012, at http://elect.ky.gov/NR/rdonlyres/F98ADBAA-79E2-4D25AA35A85ABB921BEC/0/electionschedule.pdf.

[7] The candidate filing deadline for school board elections statewide is August 10, 2010. *See* http://elect.ky.gov/NR/rdonlyres/68C89E2A-88EA-4552-9C6B-8E456866CCEF/177002/2010 ELECTIONLAWCALENDARCOUNTY1.pdf.

## CONCLUSION

All the elements for a preliminary injunction are met in this case. Using strict scrutiny, courts are near uniform in concluding that $100 contribution limits, such as that challenged here, are too low to permit effective and meaningful political advocacy; thus, Plaintiffs have a substantial likelihood of prevailing on the merits of their claims. Moreover, because the grant of preliminary injunctive relief: (1) will prevent irreparable injury to Plaintiffs; (2) will not impose undue harm upon the Defendant; and (3) will serve the public interest, Plaintiffs respectfully request that the Court grant their motion and enter a preliminary injunction barring Defendant's enforcement of KRS § 121.150(6).

Respectfully submitted,

s/ Amy D. Cubbage
**Amy D. Cubbage**
Christopher Johnson
Junis L. Baldon
FROST BROWN TODD LLC
400 West Market Street, 32nd Floor
Louisville, KY 40202-3363
Telephone:   (502) 589-5400
Facsimile:    (502) 581-1087
acubbage@fbtlaw.com
cjohnson@fbtlaw.com
jbaldon@fbtlaw.com
ACLU of Kentucky Cooperating Attorneys

**William E. Sharp**
American Civil Liberties Union of Kentucky
315 Guthrie Street, Suite 300
Louisville, KY 40202-3820
Telephone:   (502) 581-9746
Facsimile:    (502) 589-9687
sharp@aclu-ky.org

*Attorneys for Plaintiffs*

## **CERTIFICATE OF SERVICE**

      I hereby certify that on June 24, 2010, I electronically filed the foregoing Memorandum in Support of Plaintiffs' Motion for Preliminary Injunction with the Clerk of the Court by using the CM/ECF system.

      I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail to the following non-CM/ECF participant:

    Craig C. Dilger, Chairman
    Kentucky Registry of Election Finance
    140 Walnut Street
    Frankfort, Kentucky 40601-3240

                                        s/ Amy D. Cubbage
                                        **Amy D. Cubbage**

LOULibrary 0110802 . 0567876   956113v1