UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Frankfort)

| | | |
|---|---|---|
| BENJAMIN FOSTER and<br>EDWARD BRITTON, | )<br>)<br>) | |
| Plaintiffs, | )<br>) | Civil Action No. 3: 10-41-DCR |
| V. | )<br>) | |
| CRAIG C. DILGER, in his official<br>capacity as chairman, Kentucky<br>Registry of Election Finance, | )<br>)<br>)<br>) | **MEMORANDUM OPINION<br>AND ORDER** |
| Defendant. | ) | |

\*\*\*\*    \*\*\*\*    \*\*\*\*

Plaintiffs Benjamin Foster and Edward Britton have filed a Motion for a Preliminary Injunction. [Record No. 2] Plaintiffs argue that Kentucky Revised Statutes ("KRS") § 121.150(6) is unconstitutional and Defendant Dilger and the Kentucky Registry of Election Finance ("Registry") should be enjoined from enforcing the statute's limits on contributions by individuals. For the following reasons, the motion will be granted.

**I.    Background and Findings of Fact**

Plaintiffs are individuals who wish to contribute more than $100 to local school board election campaigns, but cannot do so for fear of criminal prosecution. At the current time, a donor may not contribute more than $100 to each school board candidate. KRS § 121.150(6). The pertinent portion of KRS § 121.150(6) states:

> No person, permanent committee, or contributing organization shall contribute
> more than one thousand dollars ($1,000) to any one (1) candidate, campaign

-1-

> committee, political issues committee, nor anyone acting on their behalf, in any one (1) election; except that no person shall contribute more than one hundred dollars ($100) and no permanent committee or contributing organization shall contribute more than two hundred dollars ($200) to any one (1) school board candidate, his campaign committee, nor anyone acting on their behalf, in any one (1) election.

KRS § 121.150(6). A violation of KRS § 121.150(6) carries a criminal penalty. KRS § 121.900(3). Plaintiffs claim that the provision limiting donations to candidates for school board unconstitutionally violates their First Amendment rights of expression and association. Plaintiffs brought the current action under 28 U.S.C. § 1983 challenging the constitutionality of KRS § 121.150(6) and seeking monetary and injunctive relief. The present motion requests the court to preliminarily enjoin Defendant from enforcing the statute.

The most salient facts in this case are those from Jefferson County. In Jefferson County, campaigns for school board have become increasingly expensive as a result of large independent expenditures by the Jefferson County Teachers Association ("JCTA"). In 2008, JCTA spent nearly $150,000 in support of a single candidate. [Record No. 2-1, pg. 2] Plaintiffs highlighted numerous other races where JCTA spent well over $100,000 in support of individual candidates. [Record No. 2-1, pg. 3] In contrast, candidates who rely on individual donations must raise support in $100 increments. The Registry confirmed that the overwhelming majority of candidates raise less than $3,000 per campaign from individual donors. Plaintiffs argue that the $100 limit is unconstitutional because, when viewed in contrast with the increasing amounts of independent expenditures and cost of campaigns, it drives the candidate's voice below the point of notice and effectively nullifies their ability to mount a campaign based on individual donations.

## II. Analysis

### A. Preliminary Injunction Standard

"A preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urban County Gov't*, 305 F.3d 566, 573 (6th Cir. 2002). In deciding whether the circumstances demand a preliminary injunction, the Court must "weigh carefully the interests on both sides." *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931 (1975). The Sixth Circuit has developed a well-settled, four-factor test to direct the Court's inquiry. *See, e.g., Int'l Longshoremen's Ass'n v. Norfolk Southern Corp.*, 927 F.2d 900, 903 (6th Cir. 1991), *cert. denied,* 112 S. Ct. 63 (1991). The Court should consider: (1) whether there is a strong or substantial likelihood of success on the merits; (2) whether an injunction is necessary to prevent irreparable harm to the plaintiff; (3) whether granting the injunction will cause harm to others, including the defendant; and (4) whether the public interest favors granting the injunction. *Id.* There is no rigid formality required in applying these factors and they need not be given equal weight, they are meant to guide the Court in exercising its discretion. *In re Eagle-Pitcher Indus., Inc.,* 963 F.2d 855, 859 (6th Cir. 1992). The plaintiff bears the burden of proving that an injunction is proper. *See Overstreet*, 305 F.3d at 573.

There is a threshold issue of whether a preliminary injunction is proper to grant the relief Plaintiffs request. The purpose of a preliminary injunction is to preserve the status quo between the parties pending a final determination on the merits. *Merrill Lynch, Pierce, Fenner & Smith v. Grall*, 836 F. Supp. 428, 431–432 (W.D. Mich. 1993) (citing *University of Texas v.*

*Camenisch*, 451 U.S. 390, 395 (1981)). In this case, the status quo is the operation and enforcement of KRS § 121.150(6). It could be argued that enjoining enforcement of the statute would be improper because doing so would disrupt the status quo rather than preserve it. However, the Sixth Circuit has held that "[t]oo much concern with the status quo may lead a court into error." *Stenberg v. Cheker Oil Co.*, 573 F.2d 921, 925 (6th Cir. 1978). There is no "particular magic" in the phrase "status quo." *Id.* "The purpose of a preliminary injunction is always to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits." *Id.* If the current status quo is the cause of the irreparable injury, the Court should alter the status quo to prevent the injury. *Id.* In doing so, the Court returns to the "last uncontested status quo between the parties." *Id.* (citing *Ross-Whitney Corp. v. Smith Kline & French Laboratories*, 207 F.2d 190 (9th Cir. 1953)). Here, there is no bar to the Court granting a preliminary injunction because it would disrupt the "status quo." Where the plaintiff has met its burden on the general requirements for an injunction, granting the injunction is within the Court's discretion.

        **B.**        **Irreparable Injury**

Plaintiffs correctly contend that they will suffer irreparable harm if the Court does not enjoin enforcement of KRS § 121.150(6). The violation of an individual's constitutional guarantees is intolerable and undoubtably causes irreparable injury. The Supreme Court has recognized that "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 372 (1976); *see also Newson v. Norris*, 888 F.2d 371, 378 (6th Cir. 1989) ("[E]ven minimal infringement upon

First Amendment values constitutes irreparable injury sufficient to justify injunctive relief."). If KRS § 121.150(6) does in fact violate Plaintiffs' constitutional freedom of association or speech, allowing its continued operation would cause Plaintiffs irreparable harm.

Defendant responds that Plaintiffs do not have a reasonable fear that they will be prosecuted for their conduct. [Record No. 15, p. 13] Defendant bases this argument on the regulatory role of the Registry versus the prosecutorial role of the Attorney General. [*Id.*] However, the Court is not persuaded by this argument. The Registry has a duty to refer cases to the Attorney General in which it finds probable cause of campaign finance regulations. KRS § 121.140(5) ("If the registry concludes that there is probable cause to believe that the campaign finance law has been violated willfully, it . . . shall refer such violation to the Attorney General."). Additionally, the Registry has the power to prosecute violations itself — if the Attorney General does not prosecute the violation in a timely fashion, the Registry may petition the court to appoint the Registry's attorney to prosecute the violation. KRS § 141.140(5). There is no reason to believe the Registry will voluntarily decline to either refer to the Attorney General or actually prosecute violations of KRS § 121.150(6). As such, the potential harm to Plaintiffs is real, concrete, and irreparable.

      **C.**    **Likelihood of Success on the Merits**

The question then becomes whether KRS § 121.150(6) violates Plaintiffs' constitutional right or, in other words, whether Plaintiffs are likely to succeed on the merits of their challenge. To satisfy their burden on this element, the Plaintiffs must show they have "a strong or substantial likelihood of success on the merits." *Mason County Med. Ass'n v. Knebel*, 563 F.2d

256, 261 (6th Cir. 1977). After considering the respective arguments, the Court concludes that the Plaintiffs have shown a substantial likelihood of success on their constitutional challenge.

### 1. Standard of Scrutiny

The initial issue in determining whether Plaintiffs are likely to succeed on the merits is what standard of scrutiny should be applied to the provision they challenge. Under Supreme Court precedent, there is a distinction between the standard of scrutiny applied to regulations of campaign *expenditures* and those limiting campaign *contributions*. *Buckley v. Valeo*, 424 U.S. 1, 25 (1976). Despite Plaintiffs' contention that this distinction is "dubious" [Record No. 16, p. 2] and "meaningless" [*Id.*, p. 3], both the Supreme Court and Sixth Circuit have continued to apply it in their holdings. *See, e.g.*, *Citizens United v. FEC*, 130 S. Ct. 876, 909 (2010) ("*NRWC* thus involved contribution limits, which, *unlike* limits on independent expenditures, have been an accepted means to prevent *quid pro quo* corruption." (emphasis added) (internal citations omitted)); *McConnell v. FEC*, 540 U.S. 93, 134 (2003); *FEC v. Beaumont*, 539 U.S. 146, 162 (2003); *Nixon v. Shrink Missouri Gov't PAC*, 528 U.S. 377, 387 (2000) ("We have consistently held that restrictions on contributions require less compelling justification than restrictions on independent spending."); *Buckley*, 424 U.S. at 44–45; *Anderson v. Spear*, 356 F.3d 651, 666–67 (6th Cir. 2004) ("This distinction is of particular import because of the dichotomy *Buckley* recognized between contributions and expenditures."); *Frank v. City of Akron*, 290 F.3d 813, 817 (6th Cir. 2002). *Cf. Anderson*, 356 F.3d at 666–67 (invalidating KRS § 121A.010(11) because it conflated expenditures and contributions).[1] While limits on expenditures are subject to strict

---

[1] The Court's recent holding in *Citizens United* did not alter this particular line of precedent. In *Citizens United*, the Court made expressly clear it was *not* addressing limits on direct contributions nor

-6-

scrutiny, see *Buckley*, 424 U.S. at 44–45, limits on contributions are subject to "less rigorous scrutiny," *McConnell*, 540 U.S. at 136 & n.39. Contribution limits must be "closely drawn to match a sufficiently important [governmental] interest." *Anderson*, 356 F.3d at 670 (quoting *Mcconnell*, 540 U.S. at 136). KRS § 121.150(6) limits direct contributions. Therefore, to withstand constitutional scrutiny, the regulation must be closely drawn to a sufficiently important governmental interest.

Plaintiffs contend that KRS § 121.150(6) should be scrutinized as a violation of both the freedom of speech and freedom of association. This ruling focuses principally on the association challenge for two reasons. First, freedom of speech challenges bear little on the analysis of contribution limits. *Buckley*, 424 U.S. at 20–21. In *Buckley*, the Court held:

> [A] limitation upon the amount that any one person or group may contribute to a candidate or political committee entails only a marginal restriction upon the contributor's ability to engage in free communication. A contribution serves as a general expression of support for the candidate and his views, but does not communicate the underlying basis for support. . . . A limitation on the amount of money a person may give to a candidate or campaign organization thus involves little direct restraint on his political communication, for it permits the symbolic expression of support evidenced by a contribution but does not in any way infringe the contributor's freedom to discuss candidates and issues.

*Id.* In effect, "limiting contributions [leaves] communication significantly unimpaired." *Nixon*, 528 U.S. at 387.

---

changing the standard of scrutiny courts should utilize in analyzing such limits. *Citizens United v. FEC*, 558 U.S. 50, 130 S. Ct. 876, 909 (2010) ("Citizens United has not made direct contributions to candidates, and it has not suggested that the Court should reconsider whether contribution limits should be subjected to rigorous First Amendment scrutiny."); *see also Republican Nat. Committee v. FEC*, 698 F. Supp. 2d 150, 156 (D.D.C. 2010) ("*Citizens United* expressly left intact this portion of *McConnell*.").

Second, the distinction between speech and association does little to alter the constitutional analysis. The Court has held that contribution limits "bear more heavily on the associational right than the freedom to speak." *Id.* at 388. Accordingly, the Court proceeds "on the understanding that a contribution limit surviving a claim of associational abridgement would survive a speech challenge as well." *Id.* Although the inverse is not necessarily true — that a statute which abridges associational freedoms would necessarily violate freedoms of speech — the abridgement of associational freedoms alone is sufficient to declare a stature unconstitutional. As such, only the associational analysis is necessary to properly address a constitutional challenge.

Under a freedom of association analysis, the standard of scrutiny remains the same as previously outlined. An interference with protected rights of political association can only be sustained if the government provides "a sufficiently important interest and employs means closely drawn to avoid unnecessary abridgement of associational freedoms." *Buckley,* 424 U.S. at 25.

### 2. The Government's Interest

Defendant asserts that the regulation's purpose is to prevent corruption or the appearance of corruption. [Record No. 15-1, pg. 8] This interest is clearly important. *See, e.g., First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 788, n.26 (1978) ("The importance of the governmental interest in preventing [corruption] has never been doubted."); *Anderson*, 356 F.3d at 670 ("[A]voiding corruption and the appearance of corruption is sufficient to justify limitations on contributions."). The Court in *Citizens United* explained that the anti-corruption rationale is

limited to the prevention of actual *quid pro quo* corruption or the appearance of such.[2] *Citizens United*, 130 S. Ct. at 910. Defendant has provided a sufficiently important justification for KRS § 121.150(6), because it is intended to prevent *quid pro quo* corruption or the appearance of such corruption.

The Registry advanced a second rationale for the regulation: the efficient operation of common schools "with no political influence." *See Rose v. Council for Better Education, Inc.*, 790 S.W.2d 186, 212–13 (Ky. 1989). In *Rose*, the Kentucky Supreme Court struck down the former system of common school financing and declared the common school system "inefficient." *Rose*, 790 S.W.2d. The court provided an outline for developing a new system, and included the provision that "Common schools shall be monitored by the General Assembly to assure that they are operated with no waste, no duplication, no mismanagement, and *with no political influence.*" *Id.* at 212–13 (emphasis added). The Registry claims that this one line of the court's opinion—suggesting schools be operated without political influence—constitutionally justifies the contribution limits at issue.

The Court does not find the justification of "eliminating political influence in schools" sufficiently important to justify the abridgement of individuals' associational rights. First, a plain reading of *Rose* shows that the court was not addressing school board elections or any of

---

[2] Plaintiffs again misstate the Court's holding in *Citizens United*. Plaintiffs attempt to claim that preventing "the *appearance* of corruption is no longer considered a compelling government interest after *Citizens United*." [Record No. 16, p. 6] However, a plain reading of *Citizens United* does not support that conclusion. The Court favorably cited its holding in *Buckley* and left it unchanged, writing, "The *Buckley* Court, nevertheless, sustained limits on direct contributions in order to ensure against the reality *or appearance* of corruption. That case did not extend this rationale to *independent expenditures*, and the Court does not do so here." *Citizens United*, 130 S. Ct. at 908 (emphasis added). It seems clear the Court did not intend to invalidate preventing the appearance of corruption as a sufficient justification for contribution limits.

the First Amendment rights they implicate. The court was addressing the constitutionality of Kentucky's public school financing scheme, not the election of the individuals who would administer it. Second, even if the legislature did create the current campaign regulations with *Rose's* dicta in mind, it would still not be sufficiently important. The Registry did not advance any precedent which holds "eliminating political influence" is sufficiently important to justify abridgement of associational rights. Additionally, the purported justification is illogical in support of a campaign financing scheme. The Court does not find the argument persuasive that the legislature was attempting to remove all *politics* from an *election*. That is an argument for eliminating elections, not regulating contributions. However, to the extent "political influence" means *quid pro quo* corruption, the government has asserted a sufficiently important interest.

### 3. Whether the Regulation is "Closely Drawn" to Prevent *Quid Pro Quo* Corruption

While there is little doubt about the sufficiency of the government's interest, the question becomes whether KRS § 121.150(6) is closely drawn to achieve its stated purpose. A statute is closely drawn when its enforcement does not substantially burden an individual's rights more than is necessary to further the government's legitimate interests. *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989).

Plaintiffs contend that the $100 limit is so small that it impermissibly burdens Plaintiffs' associational rights more than is necessary to simply prevent corruption. This argument has substantial merit. While the Court has held that the dollar amount of a contribution "need not be 'fine tuned,'" *Nixon*, 528 U.S. at 388 (citing *Buckley*, 424 U.S. at 30), there is a point at which a limit is so low as to effectively abridge an individual contributor's associational rights. The

Court in *Nixon* recognized that some limits may be "so radical in effect as to render political association ineffective, drive the sound of a candidate's voice below the level of notice, and render contributions pointless." *Id.* at 397. The issue, the Court held, "must go to the power to mount a campaign with all the dollars likely to be forthcoming." *Id.*

Plaintiffs have produced evidence which shows a substantial likelihood that the statute's $100 limit is so low as to make individual contributors' political association ineffective. The analysis of whether a contribution limit falls below the *Nixon* threshold is highly fact-intensive. For that reason, this decision does not reach the merits of Plaintiffs' constitutional challenge. However, the Court does find that Plaintiffs have produced sufficient evidence to show a substantial likelihood of success on the merits.

At the outset, a regulation limiting contributions over $100 cannot be *per se* too low. The Sixth Circuit approved a $100 contribution limit for the City of Akron's municipal elections. *Frank v. City of Akron*, 290 F.3d 813 (6th Cir. 2002). However, the Sixth Circuit's holding in *Frank* is distinguishable from the case at bar. The amendment to the City of Akron's charter limited contributions for elections in one locality: Akron. *Id.* at 815. The court explained that the limit did not fall below the *Nixon* threshold because it did not inhibit candidates from accumulating substantial war chests. *Id.* at 818. The limit did not drive the voice of the candidate below notice because candidates in Akron elections rarely used mass media or television in the way candidates in larger campaigns did. *Id.* The court found the $100 limit closely drawn to prevent *quid pro quo* corruption in the Akron municipal elections. *Id.*

The same cannot be said for a $100 limit for all school board elections across the Commonwealth. Other courts have considered equally low limits and found that they were not "closely drawn." *See Russel v. Burris*, 146 F.3d 563, 568 (8th Cir. 1998) (striking down contribution limits of $100 and $300 for statewide candidates); *Carver v. Nixon*, 72 F.3d 633, 644 (8th Cir. 1995) (striking down a system of tiered contribution limits based on the size of the district, where districts with fewer than 100,000 residents were subject to a $100 contribution limit); *Nat'l Black Police Ass'n v. Dist. or Columbia Bd. of Elections and Ethics*, 924 F. Supp. 270, 282 (D.D.C. 1996) (holding a $100 contribution limit for mayoral elections unconstitutional).

Defendants have not shown that any of the factors which distinguished *Frank* from this line of precedents are present in this case. First, Jefferson County is significantly larger than the City of Akron. Campaigns in Jefferson County have become increasingly expensive and candidates who rely on individual donations cannot compete. Well-funded candidates regularly utilize expensive mass-media to support their campaigns. Large independent expenditures have driven up the costs of campaigns and made it unrealistic to mount a campaign based solely on individual contributions. The facts which the court found persuasive in *Frank* do not apply to school board elections in counties such as Jefferson County. Plaintiffs' constitutional rights are in danger because KRS § 121.150(6)'s $100 limit threatens to make their individual contributions, and political association, absolutely ineffective. As the *Nixon* court stated, the issue is the power to mount a campaign with the dollars likely to be forthcoming. *Nixon*, 528 U.S. at 397. Here, the Plaintiffs have shown that mounting a campaign on individual

contributions is nearly impossible in Jefferson County. Defendant argues that in smaller counties, such as Clay County or Breathitt County, raising the limit to $1,000 is imprudent because that amount "could buy contributors considerable influence." [Record No. 15, p. 12] They demonstrate the tailoring problem precisely. While a $100 limit may be necessary to prevent *quid pro quo* corruption in smaller counties, a $100 contribution is insignificant in Jefferson County. If the purpose is to prevent *quid pro quo* corruption, the potential for such corruption at a particular dollar amount cannot be the same in every county of every size statewide. The charter amendment in *Frank* was upheld because it was closely drawn to the need to prevent corruption in a particular city election. The Registry has not provided evidence to show that a limit as low as $100 is closely drawn to prevent *quid pro quo* in places such as Jefferson County. In those counties, such a limit is so low as to nullify Plaintiffs' associational exercise.

Based upon the foregoing analysis, the Plaintiffs have made a sufficient showing that they have a substantial likelihood of success on the merits of their constitutional challenge.

### D. Injury to Others

Defendant argues that the Registry and other candidates for school board will be harmed by the granting of a preliminary injunction. [Record No. 15, p. 14–15] He asserts that an injunction will harm the Registry because the Registry has already printed materials outlining the current guidelines and changing the guidelines would cause confusion and expense. [*Id.*] Defendant also argues other candidates will be injured who had "planned their campaign

strategies taking into account the $100 contribution limit." [*Id.*, p. 14] The Court does not find either of these arguments persuasive.

The harm and difficulty of changing a regulation cannot be said to outweigh the violation of constitutional rights it perpetuates. It would be far worse that an election continue under an unconstitutional regime than the Registry experience difficulty or expense in altering that regime. Further, it is unlikely any individual candidate will be harmed by an injunction. First, the Defendant has offered no proof to support his contention that all candidates have built their campaign strategies around $100 limits. Second, the change in regulations will apply to all candidates. No one candidate will suddenly be on stronger footing than another. All will be allowed to solicit $1,000 donations. It is unlikely that the availability of an extra $900 per donor, by being able to solicit $1,000 rather than $100, will cause harm to an individual candidate. When the potential harm to Plaintiffs is the violation of their constitutional rights and the potential harms to Defendant and others are small, the balance of hardships weighs in favor of granting the injunction.

### E. The Public Interest

"It is in the public interest not to perpetuate the unconstitutional application of a statute." *Martin-Marietta Corp. v. Bendix Corp.*, 690 F.2d 558, 568 (6th Cir. 1982); *see also G & V Lounge v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1999) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights."). Every citizen of Kentucky, not just the individual plaintiffs, has a constitutionally-protected interest in political association. When a statute potentially violates that interest, the public interest weighs in favor

of enjoining its enforcement. Here, Plaintiffs have met their burden of showing that they have a substantial likelihood of success on the merits of their challenge, and the public interest weighs in favor of enjoining the continued enforcement of the potentially unconstitutional provision.

    **F.**    **Scope of Injunction**

When a court confronts a constitutional flaw in a statute, the court should "fit the solution to the problem" and enjoin only the unconstitutional applications while leaving the other applications in force. *Ayotte v. Planned Parenthood*, 546 U.S. 320, 328–29 (2006); *see also Planned Parenthood Cincinnati Region v. Strickland*, 531 F.3d 406, 410 (6th Cir. 2008). Accordingly, there is no need for the Court to enjoin the enforcement of KRS § 121.150(6) altogether. The Court will limit the scope of its injunction to the enforcement of the $100 contribution limit for individual donors to school board campaigns. The $1,000 limit on contributions stands and now governs campaigns for school board as well.

Additionally, Plaintiffs have chosen not to join the Attorney General in this action. That is Plaintiff's choice. *See Women's Medical Professional Corp. v. Voinovich*, 130 F.3d 187, 211 (6th Cir. 1997). However, Rule 65 makes clear that an injunction may only bind three groups: 1) the parties; 2) the parties' officers, agents, servants, employees, and attorneys; or 3) other persons who are in active concert or participation with those previously named groups. Fed. R. Civ. Pro. 65(d)(2). Accordingly, this injunction is limited by Rule 65. It only enjoins the named party — the Registry — and its agents or employees from enforcing the $100 contribution limit or exercising its civil or criminal authority to prosecute violators of the limit

    **III.**    **Conclusion**

Plaintiffs have met their burden of showing that a preliminary injunction is proper. They have proven that their constitutional right of association is in danger and that they will suffer irreparable harm if the Court does not issue an injunction. They have also demonstrated a substantial likelihood of success on the merits of their constitutional challenge to KRS § 121.150(6). They have further shown that an injunction would not cause undue harm to others and that the public interest supports an injunction. For these reasons, it is hereby

**ORDERED** that Plaintiffs' Motion for a Preliminary Injunction [Record No. 2] is **GRANTED**. The Court **PRELIMINARILY ENJOINS** the Registry from enforcing KRS § 121.150(6)'s $100 contribution limit in school board campaigns or prosecuting individuals for contributing amounts above that limit.

This 9th day of September, 2010.

Signed By:
*Danny C. Reeves* DCR
United States District Judge